Beth S. Ginsberg, D.C. Bar No. 448118
Jason T. Morgan, WSBA No. 38346
Stoel Rives LLP
600 University Street, Suite 3600
Seattle, Washington 98101
Phone: (206) 624-0900
Fax: (206) 386-7500
Email: bsginsberg@stoel.com
        jtmorgan@stoel.com

*Attorneys for Plaintiffs United Cook Inlet Drift Association and
Cook Inlet Fishermen's Fund*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED COOK INLET DRIFT ASSOCIATION, and COOK INLET FISHERMEN'S FUND<br><br>        Plaintiffs,<br><br>v.<br><br>NATIONAL MARINE FISHERIES SERVICE; REBECCA BLANK, in her official capacity as the Acting United States Secretary of Commerce; JANE LUBCHENCO, in her official capacity as Administrator, National Oceanic and Atmospheric Administration; and JAMES W. BALSIGER, in his official capacity as NMFS Alaska Region Administrator,<br><br>        Defendants. | Civil Action No.: __1:13-cv-82____<br><br>**COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF, AND PETITION FOR REVIEW (42 U.S.C. § 4332; 16 U.S.C. §§ 1801-1891d; 5 U.S.C. §§ 553, 701-706)** |

## SUMMARY OF ACTION

1.     Plaintiffs in this case are associations that represent the interests of commercial

salmon fishermen and seafood processors in Cook Inlet, Alaska, their families and employees,

*United Cook Inlet Drift Association, et. al., v. NMFS, et al.*

and the communities that depend on the continued viability of commercial fishing in the Inlet.

Plaintiffs bring this action on behalf of their members asserting causes of action against the

above-named federal Defendants ("Defendants" or, collectively, National Marine Fisheries

Service ("NMFS")) challenging regulations adopted by NMFS on December 21, 2012 to

implement and approve Amendment 12 to the *Fishery Management Plan for Salmon Fisheries in

the EEZ off the Coast of Alaska* (the "Salmon FMP").  *See* 77 Fed. Reg. 75,570 (Dec. 21, 2012).

As discussed more fully below, Amendment 12 to the Salmon FMP and NMFS's regulations

implementing that Amendment are arbitrary, capricious, and contrary to the Magnuson-Stevens

Fishery Conservation and Management Act ("MSA"), 16 U.S.C. §§ 1801-1819d; the National

Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq.; and the Administrative

Procedure Act ("APA"), 5 U.S.C. §§ 551-559, 701-706.

2.       This action arises from NMFS's decision to approve changes to the Salmon FMP

to eliminate federal waters in Cook Inlet from that FMP over the objections of Plaintiffs and

other members of the commercial fishing community.  In 2007, Congress amended the MSA to

require updates of all fishery management plans ("FMPs").  The purpose of the MSA is to

conserve and manage the fishery resources of the United States and to promote commercial and

recreational fishing under sound conservation and management principles.  16 U.S.C. § 1801(b).

The MSA achieves those goals through the preparation and implementation of fishery

management plans ("FMPs"), based on sound science, that will achieve and maintain the

optimum yield (the amount of fish that will produce the greatest overall benefit to the nation)

from each fishery.  *Id.*

3.       NMFS's response to the Congressional requirement to update all FMPs was to

amend the Salmon FMP to eliminate Cook Inlet (and two other federal fisheries) from the FMP

*United Cook Inlet Drift Association, et. al., v. NMFS, et al.*

through Amendment 12.  In so doing, NMFS conveniently avoided the Congressional obligation

to update the FMP for these areas.  With Amendment 12, NMFS formally abandoned federal

management and oversight of the Cook Inlet salmon fisheries – home to some of the largest wild

salmon runs in the world – concluding that federal management was unnecessary and that the

State of Alaska was managing this fishery in a manner consistent with the MSA.  NMFS's

conclusion is contrary to the MSA, and to the evidence in the record, and fundamentally arbitrary

and capricious.

4.      Cook Inlet salmon fisheries have been, and are, declining in Cook Inlet.  As

discussed more fully below, the primary reason for that decline has been management failures by

the State of Alaska to use the science-based, transparent procedures contemplated in the MSA.

The decision to formally remove Cook Inlet from the FMP, and turn over all management to the

State of Alaska, ensures that this trend will continue and that the optimum yield goals of the

MSA will never be realized.

5.      Equally important, even if the State were managing the Cook Inlet salmon

fisheries in a manner consistent with the MSA, NMFS's decision to turn over management to the

state by eliminating Cook Inlet from the FMP still violates the MSA.  The MSA requires a

fishery management plan for every federal fishery that "that requires conservation and

management." *Id.* § 1852(h)(1).  The MSA contemplates that the FMP may delegate day-to-day

management of a fishery to a state through an FMP, provided that the state's laws and

regulations are consistent with the FMP.  *Id*. at § 1856(3).  This is precisely what Plaintiffs asked

NMFS to do, and precisely what the Salmon FMP does for other federal salmon fisheries in

Alaska.

*United Cook Inlet Drift Association, et. al., v. NMFS, et al.*

3

6.     But rather than follow the carefully crafted process outlined by Congress (and utilized by NMFS for other federal salmon fisheries) NMFS chose a completely different route for Cook Inlet, arbitrarily removing it from the FMP so that the state can manage the fishery by default.   But there is no provision allowing NMFS to abandon management to the State by eliminating a federal fishery from an FMP.   Indeed, as explained more fully below, NMFS's removal of Cook Inlet from the Salmon FMP in Amendment 12 actually creates a jurisdictional loophole, whereby vessels not registered in the state of Alaska may fish for salmon in the federal waters of Cook Inlet without a permit and without time or gear restrictions to the detriment of valid permit holders such as Plaintiffs' members.

7.     For all these reasons, and those discussed below, Plaintiffs respectfully request this Court to vacate the decision approving Amendment 12 and its implementing regulations, and seek an order requiring NMFS to comply with the MSA and develop an appropriate FMP that covers Cook Inlet.   Plaintiffs request the Court to declare that Amendment 12, its underlying implementing regulations, and NMFS's NEPA Finding of No Significant Impact ("FONSI") are arbitrary, capricious, and an abuse of discretion; not in accordance with law; and in excess of statutory jurisdiction, authority, or limitations.   Plaintiffs further seek an order vacating Amendment 12 and its underlying implementing regulations, and the FONSI, and remanding to Defendants, as appropriate, to reconsider these actions based on this Court's ruling and applicable law.

## PARTIES

### Plaintiffs

8.     Plaintiff, the United Cook Inlet Drift Association ("UCIDA"), is a corporation in good standing registered under the laws of the State of Alaska.   UCIDA represents the economic,

*United Cook Inlet Drift Association, et. al., v. NMFS, et al.*

4

social, and political interests of drift gillnet fishermen and their families in Cook Inlet, Alaska. UCIDA currently has approximately 250 members who hold limited-access salmon driftnet fishing permits, issued by the State of Alaska, in Cook Inlet.

9.     UCIDA's members make their living by commercial fishing.  UCIDA's members hold State of Alaska limited-entry permits (meaning permits can no longer be issued, and are fully allocated), which authorize them to catch all five species of salmon: sockeye, coho, chinook, chum, and pink.  The majority of drift gillnet fishing by UCIDA's members in Cook Inlet occurs within federal waters in the exclusive economic zone ("EEZ").

10.     Drift gillnet boats are small-scale fishing operations, typically crewed by one to three persons.  Each fishing operation represents a substantial investment in the boat, gear, and the permit itself.  Each boat is generally allowed to deploy a single 900-foot-long gillnet.  The gillnet is suspended in the water column by floats (called "corks") as the boat drifts with the current – hence the name "drift gillnet."  After the gillnet is allowed to "soak" in the water for a length of time (as the boat and net drift with the current), the gear is hauled in, and the fish are removed and placed on ice in the boat's hold.  Those fish are then transported to, and offloaded at, one of Cook Inlet's local seafood processors in fishing communities such as Kenai, Kasilof, Ninilchik, or Homer.  After processing, these salmon are delivered throughout the United States and around the world.

11.     In addition to permit holders, UCIDA has approximately 65 associational members including fish processors, gear suppliers, crew members, and other interested members of the community.

12.     UCIDA's mission is to promote public policy that facilitates the science-based and orderly harvest of Cook Inlet salmon in a manner that is economically and ecologically

*United Cook Inlet Drift Association, et. al., v. NMFS, et al.*

sustainable and that protects commercial salmon fishing in Cook Inlet as a viable way of life.

UCIDA and its members are committed to the protection of the environment of Cook Inlet, and

to ensuring that its marine resources are both managed and conserved to enhance the health and

productivity of the ecosystem.  To that end, UCIDA has advocated in state and federal forums

for management of these stocks in a manner consistent with the goals and objectives of the MSA,

including management consistent with the MSA's Maximum Sustainable Yield ("MSY")

principles (MSY is defined at 50 C.F.R. §600.310(e)(1)(A)(i) as the largest long-term average

catch or yield than can be taken from a stock or stock complex under prevailing ecological,

environmental conditions).  The relief UCIDA seeks in this lawsuit is germane to its

organizational purpose.

13.     Plaintiff Cook Inlet Fishermen's Fund ("CIFF") is a non-profit corporation

registered under the laws of the State of Alaska.  CIFF has 446 members, including commercial

fishermen of all gear types (including 201 driftnet fishermen and 224 set net fishermen), seafood

processors, and community members.  The majority of CIFF's members are from Alaska, but

CIFF also has members 21 other states, including Washington, Oregon, Utah, California,

Minnesota, Iowa, Wisconsin, New York, Arizona, Delaware, Texas, Colorado, Florida, Indiana,

New Mexico, Oklahoma, South Dakota, Virginia, Vermont, and Wyoming.

14.     CIFF's mission is to advocate on behalf of all commercial fishermen of Cook

Inlet and for the coastal community more generally.  CIFF's members and volunteers are fueled

by the desire to save the commercial fishing industry in Cook Inlet as well as all of Alaska.  The

relief CIFF seeks in this case is germane to its organizational purpose.

15.     Plaintiffs, directly or through their members, fully participated, to the limited

extent allowed by NMFS and the North Pacific Fisheries Management Council ("Council"), in

*United Cook Inlet Drift Association, et. al., v. NMFS, et al.*

the proceedings pre-dating the decisions challenged in this lawsuit.  Plaintiffs submitted detailed written comments and testimony on Amendment 12 and its implementing regulations and the accompanying draft environmental assessment ("EA").

16.     Plaintiffs have standing to bring this action because their members are directly and adversely impacted by Amendment 12 and its implementing regulations, which remove Cook Inlet from the Salmon FMP and thus the protections of the MSA.  Plaintiffs and their members are also adversely impacted by Defendants' failure to comply with the procedural requirements of NEPA and the MSA.  The challenged agency decisions are final and ripe for review by this Court.

## Defendants

17.     NMFS is an agency of the National Oceanographic and Atmospheric Administration ("NOAA"), United States Department of Commerce.  Among its duties, NMFS is responsible for managing commercial marine fisheries to ensure sustainable harvests that provide the greatest overall benefit to the nation pursuant to the MSA.

18.     Defendant Rebecca Blank is the Acting Secretary of the United States Department of Commerce and is sued in her official capacity.  Secretary Blank directs all business of the Department of Commerce, including NOAA and its agency, NMFS.  Through these agencies, Secretary Blank is ultimately responsible for the approval of Amendment 12, its implementing regulations, and the EA and corresponding FONSI, and is further responsible for the Department of Commerce's compliance with federal law, including NEPA, the MSA, and the APA.

19.     Defendant Jane Lubchenco is the Administrator of NOAA and is sued in her official capacity.  The Secretary of Commerce has delegated responsibility to the NOAA Administrator to ensure compliance with NEPA, the MSA, and the APA, and to promote

*United Cook Inlet Drift Association, et. al., v. NMFS, et al.*

7

effective management and stewardship of the nation's fisheries resources and assets to ensure sustainable economic opportunities.  The NOAA Administrator, in turn, has sub-delegated this responsibility to NMFS.

20.    Defendant James Balsiger is the Administrator of the NMFS Alaska Region and is sued in his official capacity.  Dr. Balsiger is listed as the responsible official for the EA.

## JURISDICTION AND VENUE

21.    This Court has jurisdiction over this action pursuant to 5 U.S.C. §§ 701-706 (APA), 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 2201 (declaratory judgments), 28 U.S.C. § 2202 (injunctive relief), and 16 U.S.C. §§ 1855(f) and 1861(d) (MSA).

22.    Defendants have waived sovereign immunity in this action pursuant to 5 U.S.C. § 702 and 16 U.S.C. § 1855(f).

23.    Plaintiffs have exhausted all administrative remedies.

24.    Venue is properly vested in this Court under 28 U.S.C. § 1391(e) because this action is brought against the Secretary of Commerce, and his or her delegates.  The Secretary of Commerce is charged by Congress with the responsibility for making the challenged decision. The Office of the Secretary of Commerce is located within the judicial district, and a substantial part of the acts or omissions giving rise to this action occurred within the judicial district.

## STATUTORY FRAMEWORK

### The Magnuson-Stevens Fishery Conservation and Management Act

25.    The MSA is the primary domestic legislation governing management of federal fisheries.  16 U.S.C. §§ 1801-1891d.

*United Cook Inlet Drift Association, et. al., v. NMFS, et al.*

73222032.3 0014655-00002

26.     The MSA created eight regional fishery management councils that are primarily charged with preparing FMPs and plan amendments for each managed federal fishery.  *Id.* § 1852(a)(1).

27.     The MSA requires an FMP for each fishery under the regional council's jurisdiction "that requires conservation and management."  *Id.* § 1852(h)(1).  The FMP is the foundational document for management of each fishery and provides the framework for ensuring that fisheries are managed in a manner consistent with the requirements of the MSA and its national standards.

28.     The MSA gives special attention to anadromous species such as salmon.  Indeed, the MSA's stated purpose is "to take immediate action to conserve and manage the fishery resources found off the coasts of the United States, and the *anadromous species* . . . of the United States."  *Id.* § 1801(b)(1) (emphasis added).

29.     The Council manages fisheries in the EEZ off Alaska's coast.  Prior FMPs developed by the Council govern the management of salmon fisheries, including but not limited to the salmon fisheries, in which Plaintiffs' members participate.

30.     The authority of a state to manage fisheries in the EEZ, beyond the state's territorial waters (3 miles for purposes of MSA), is constrained by the MSA.  The state may regulate all fishing activities in the adjacent portions of the EEZ only to the extent that the applicable FMP delegates such authority.  *Id.* § 1856(a)(3).  Absent such delegation through an FMP, the state may only regulate vessels registered under the laws of that state in the EEZ.

31.     Fishery management councils submit proposed FMPs and FMP amendments to the Secretary of Commerce for review and approval.  *Id.* §§ 1853, 1854.  All FMPs must be

consistent with the requirements of the MSA, including the 10 national standards set forth in the MSA.

32.     The MSA's national standards guide all FMPs and MSA regulations.  For example, national standard 1 requires FMPs to prevent overfishing while achieving the optimum yield from each fishery for the United States fishing industry.  *Id*. at § 1851(1).  National standard 2 requires that all conservation measures be based on the best scientific information available.  *Id*. at § 1851(2).  National standard 3 provides that fisheries should be managed as a unit throughout their range, where practicable.  *Id*. at § 1851(3).  National standard 7 requires conservation measures to, where practicable, minimize costs and unnecessary duplication.  *Id*. at § 1851(7).  National standard 8 requires conservation measures to take into account the importance of the fishery resources to fishing communities, to provide for the sustained participation of, and to minimize impacts on, such communities.  *Id*. at § 1851(8).  National standard 10 requires conservation measures to promote the safety of human life at sea.  *Id*. at § 1851(10).

33.     The Secretary of Commerce, acting through NMFS, must disapprove an FMP amendment to the extent it is inconsistent with provisions of the MSA or any other applicable law.  *Id*.

34.     The Secretary of Commerce must also approve all regulations that implement a fishery management plan.  *Id*. § 1854(b).  The Secretary must give notice of proposed rulemaking and provide an opportunity for public comment on proposed regulations.  *Id*.

35.     Any fishery management regulation implementing an FMP must be consistent with the MSA, including the 10 national standards for fishery management and conservation.  *Id*. §§ 1854(b),1851(a).

*United Cook Inlet Drift Association, et. al., v. NMFS, et al.*

73222032.3 0014655-00002

**The National Environmental Policy Act**

36.     Approvals of FMPs, FMP amendments, and implementing regulations are subject to NEPA requirements, 42 U.S.C. § 4321, *et seq*.; 16 U.S.C. § 1854(i).

37.     Congress established NEPA as "our basic national charter for protection of the environment."  40 C.F.R. § 1500.1(a).  NEPA and its implementing regulations require that federal agencies, including NMFS, must prepare an environmental impact statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C); *see* 40 C.F.R. § 1501.4.  The purpose of NEPA is to ensure that federal decision-making is fully and publicly informed through a reasonably thorough and thoughtful analysis of the probable environmental impacts resulting from a proposed federal action, and through identification and analysis of a reasonable range of alternative actions, including the no-action alternative.  In enacting NEPA, Congress sought to ensure that federal agencies take a hard look at the environmental consequences of any proposed action and required agencies to comply with the Act "to the fullest extent possible."  42 U.S.C. § 4332.

38.     NEPA requires that a federal agency proposing a major federal action with significant environmental effects prepare a detailed statement, which must include the environmental impacts of and alternatives to the proposed action.  42 U.S.C. § 4332(2)(C)(i)-(iii).  This detailed written statement is an EIS.  40 C.F.R. § 1508.11.

39.     To determine whether an EIS is necessary, an agency may first prepare an EA.  *See id*. §§ 1501.4(c), 1508.9.  An EA is a "concise public document ... that serves to ... [b]riefly provide sufficient evidence and analysis for determining whether to prepare an [EIS] or a [FONSI]."  *Id*. § 1508.9.  An EA must contain sufficient information and analysis to determine whether the proposed action is likely to have significant impacts, thus requiring preparation of an

*United Cook Inlet Drift Association, et. al., v. NMFS, et al.*
11

EIS.  *Id*.  An EA must consider a reasonable range of alternatives, and must include a reasonably thorough discussion of the direct, indirect, and cumulative impacts of the proposed alternative.

40.     If an agency concludes, based on the EA, that an EIS is not required, it must prepare a FONSI, which explains the agency's reasons for its decision.  *Id*. §§ 1501.4(e), 1508.13.

41.     The analysis of alternatives to a proposed agency action is "the heart of the environmental impact statement" and agencies should "[r]igorously explore and objectively evaluate all reasonable alternatives."  *Id*. § 1502.14.  The analysis must include a "no action" alternative, as well as reasonable alternatives beyond the agency's jurisdiction.  *Id*. § 1502.14(c)-(d).  These alternative analysis requirements also apply to EAs.  *See* 42 U.S.C. § 4332(2)(E); 40 C.F.R. § 1508.9(b).  Whether an action will have "significant" impacts requires consideration of both the context and intensity of effects.  40 C.F.R. § 1508.27.  Context refers to the significance of the action to society as a whole, the affected region, the affected interests, and the locality.  *Id*. § 1508.27(a).  Intensity refers to the severity of the impacts.  Factors considered in evaluating intensity include impacts that may be both beneficial and adverse, unique characteristics of the geographic areas, the degree to which the effects on the quality of the human environment are likely to be controversial, the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks, the degree to which the action may establish a precedent for future actions, whether the action is related to other actions with individually insignificant but cumulatively significant impacts, and the degree to which the action may adversely affect an endangered or threatened species or its critical habitat.  *Id*. § 1508.27(b).

*United Cook Inlet Drift Association, et. al., v. NMFS, et al.*

12

42.     For ongoing actions, federal agencies have a duty to supplement their NEPA analysis whenever (a) the agency makes substantial changes to the proposed actions; or (b) significant new circumstances or information exists relevant to environmental concerns and bears on the proposed action or its impacts.  *Id.* § 1502.9(c)(1).

## The Administrative Procedure Act

43.     The APA provides for judicial review of final agency action by persons "aggrieved" by such action.  5 U.S.C. § 702.  The actions reviewable under the APA include any "preliminary, procedural, or intermediate agency action or ruling . . . on the review of the final agency action."  *Id*. § 704.

44.     The APA also provides standards applicable when a federal agency proposes and adopts final rules and regulations.  *Id*. §§ 553, 551(4).  Specifically, agencies must provide "[g]eneral notice" of any "proposed rule making" to the public through publication in the Federal Register.  That notice must include: "(1) a statement of the time, place, and nature of public rule making proceedings; (2) reference to the legal authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved."  *Id*. § 553(b).  An agency's responsibility to consider public comments on a proposed rulemaking is required by 5 U.S.C. § 553(c).

45.     Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Id*. § 706(2).  A reviewing court shall also "hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law."  *Id.*.

*United Cook Inlet Drift Association, et. al., v. NMFS, et al.*

73222032.3 0014655-00002

## STATEMENT OF FACTS

### The Cook Inlet Salmon Fishery

46.     Upper Cook Inlet is home to five species of anadromous salmon – chinook, sockeye, coho, pink, and chum – as well as steelhead trout.  Cook Inlet is also home to some of the largest natural, wild returns in the nation for chinook, sockeye, coho, pink, chum, and steelhead.

47.     The Kenai River sockeye runs in Cook Inlet, in particular, are world-class, with the potential to produce millions of adult sockeye returns annually.  These sockeye are also genetically unique, with an unusual variety in the age and size of adult returning stocks.

48.     The commercial fishery on these Cook Inlet anadromous stocks dates back to at least 1882, utilizing all manner of gear types, from fishwheels to driftnets.  The federal government expressly recognized the national importance of maintaining this commercial fishery in 1952 when it negotiated by treaty to exclude Cook Inlet from an international treaty banning most net fishing activities outside of state waters.

49.     Commercial fishing in Upper Cook Inlet is currently limited to two gear types (set and drift gillnets) and occurs on all five Cook Inlet anadromous salmon stocks.  Set net operations deploy gillnets from fixed locations near shore, anchored to the bottom, and commonly extending in sections as far as one and half miles off shore.  Drift gillnets, by contrast, are deployed from small vessels.  Each drift gillnet is approximately 900 feet long.

50.     The majority of commercial fishing in Upper Cook Inlet is for sockeye.  From 1966 through 2012 (excluding 1989, following the Exxon Valdez oil spill), the commercial catch of sockeye in Upper Cook Inlet ranged from 497,185 fish to 9.5 million fish.  In 2010 the commercial catch was 2.8 million sockeye.  Approximately 56% of those fish (1.59 million)

*United Cook Inlet Drift Association, et. al., v. NMFS, et al.*

were caught by the drift fleet. The remaining 44% were caught by set nets.  The vast majority of the commercially caught Cook Inlet salmon find their way to grocery stores and restaurants in the United States.  Cook Inlet salmon are an important and healthy part of the nation's food supply.

51.    The Cook Inlet salmon fishery is highly competitive and requires conservation and management.

**The 1990 Salmon FMP**

52.    The last major revision to the Salmon FMP was in 1990.  The 1990 Salmon FMP has two management areas: the East Area and the West Area.  The border between the two areas is the longitude of Cape Suckling.

53.    The 1990 Salmon FMP addressed commercial salmon fishing in the East and West Areas differently.  In the East Area (which consists primarily of coastal waters off Southeast Alaska), the 1990 FMP set forth the Council's management goals and objectives.  The 1990 FMP delegated management of East Area fisheries, consistent with the Council's management goals and objectives, to the State of Alaska.

54.    In the West Area, by contrast, the 1990 Salmon FMP provided little guidance on how to manage salmon.  Instead, the 1990 Salmon FMP closed the vast majority of the West Area to commercial fishing, consistent with prohibitions in the International Convention for the High Seas Fishery of the North Pacific Ocean ("High Seas Convention").  Also consistent with the High Seas Convention, the 1990 FMP exempted from this closure three historic net fisheries: Cook Inlet, Prince William Sound, and the Alaska Peninsula area.  The EEZ portion of Cook Inlet open to fishing is a contiguous area of approximately 1,100 square miles.  The 1990 Salmon

FMP did not expressly delegate management to the State of Alaska or set clear management goals or objectives for the West Area.

55.     The High Seas Convention was repealed and replaced in 1992 by the North Pacific Anadromous Stock Act of 1992, which contained no provisions for management of the three historic net fisheries areas.  Despite the change in the law, the Council took no action to make changes to the FMP to clarify for the West Area how it was to be managed for nearly 20 years.

**The State of Alaska's Management of the Cook Inlet Salmon Fishery**

56.     The State of Alaska has managed the salmon fisheries in Alaska since 1959.  The State of Alaska sets its fishery management policies through the Alaska State Board of Fish, and implements those management policies through the Alaska Department of Fish and Game.

57.     The State of Alaska manages salmon in Cook Inlet based on a series of state management plans.  Generally speaking, these management plans set escapement goals for salmon.  An escapement goal, in this context, is the number of salmon that the state has determined are necessary or desirable to "escape" past a fishery, and thereby, provide spawning stock for successive generations or meet other needs.

58.     The state management plans also include allocation decisions.  Allocation decisions are generally made by setting the number of fishing days allowed for a particular gear type during the season.

59.     In season, the state manages these fisheries based on assessments of run strength, as measured against desired escapement goals.  If the run strength is estimated to be larger than normal, then more fishing days are authorized to avoid exceeding maximum escapement targets. If run strengths are estimated to be smaller than normal, then fewer fishing days are authorized to

avoid dropping below minimum escapement targets.  These run strength assessments are based

on pre-season forecasts, test boat data, and other factors.

60.     Setting science-based escapement goals for salmon is essential to a well managed

fishery.  If an escapement goal is set too low, then the fishery gets over-fished and run strengths

diminish over time.  If an escapement goal is set too high, then the harvestable surplus is lost.

Where too many salmon escape and spawn, the fitness of that run may also be diminished in

future years due to density-dependent effects and other biological and ecological factors.  That is

especially the case for sockeye, where rearing space and food supply in the lakes and rivers are a

limiting factor.  Over-escapement events can reduce run strengths for two or three successive

years.

61.     The state has two basic kinds of escapement goals: biological and sustainable.

Biological escapement goals are intended to achieve the maximum sustainable yield (human

consumption for that fishery as a food resource).  Sustainable escapement goals, by contrast, are

based on historical data showing that a certain harvest level can be sustained.  In Cook Inlet, only

4% of the stocks have a biological escapement goal.

62.     Beginning in 2000, the state imposed a "Sustainable Salmon Fisheries Policy"

("SSFP") intended to ensure the long-term viability of salmon runs in Alaska.

63.     The state has affirmatively stated that it is under no obligation to comply with the

MSA in making its fishery management decisions.  Indeed, the state's record has shown that it

has not managed the fisheries, especially the fisheries in Cook Inlet, in a manner consistent with

the MSA.

64.     In 1990, when the last Salmon FMP was created, the state typically managed the

salmon fisheries in accordance with the MSA.  Beginning in 1996, the state began departing

from MSA management.  And, when the state subsequently adopted the SSFP, it no longer made any attempt to manage fisheries in Cook Inlet under MSA standards.

65.     As noted above, only 4% of the stocks in Cook Inlet have biological-based escapement goals.  Many runs in Cook Inlet have no escapement goal of any kind.  There are no escapement goals for pink salmon or steelhead, only one tributary with escapement goals for chum, and two tributaries with escapement goals for coho.  Of the 35 chinook tributaries, only seven have any escapement goals or monitoring data, and most of those seven are listed under the state designation of "stock of concern."  Equally important, between 2002 and 2010, the state missed the lower-end of its escapement goals statewide 15% of the time (resulting in over-fishing) and missed the upper-end of its escapement goals statewide 35% of the time (resulting in under-fishing).  In other words, the state misses its own goals half of the time.

66.     State management in Cook Inlet has destabilized the fishery.  As a result, many seafood processors have simply quit doing business in Cook Inlet, citing a hostile business environment created by state mismanagement as the reason.  In recent decades, the commercial catch of salmon in Cook Inlet have declined as a result of state management decisions.  Harvests of some stocks have declined as much as 50% due to state management.  Every year, millions of salmon (worth millions of dollars to local communities and businesses), above and beyond those necessary to meet biological needs, go un-harvested due to state mismanagement.

67.     While some of these declines are attributable to allocation decisions, most are the result of long-term declines in total salmon returns to the Inlet or management decisions that allow a significant harvestable surplus to go un-harvested.

68.     One such management decision is a growing trend towards terminalizing the drift fishery – that is, directing fishing nearer to shore, and nearer to the mouth of the rivers.  While

*United Cook Inlet Drift Association, et. al., v. NMFS, et al.*

18

that kind of management is effective in some locations, it is not effective in Cook Inlet due to its unique geography, and the run sizes and timing associated with the large sockeye returns in Cook Inlet.

69.     Fishing in the EEZ portions of Cook Inlet – farther from the mouth of the river, is essential to elongate the fishing season by a few days and produce an orderly fishery.  This kind of elongated fishing season reduces the risk that seafood processors will be overwhelmed as a result of too many deliveries from fishermen in to short of a period of time.  In 2011, new restrictions that limited fishing in the EEZ in favor of nearshore fishing resulted in overwhelming the processing capacity of the Inlet, massive degradation in food quality as fish essentially rotted on the docks, and a lost harvest of more than 300,000 sockeye alone.  Fishing time in the EEZ, farther from the terminal points, also allows more data to be gathered to assess run strength and allows fishery managers to make better informed decisions.

70.     The state's failures in management fully were demonstrated in the summer of 2012.  Early in the fishing season, the state incorrectly determined that returns of chinook salmon to the Kenai River were expected to be low, below biological goals.  In order to ensure the chinook returns were met, the state completely closed the commercial set net fishery that largely targets sockeye salmon, closed recreational fishing for chinook, and asked the U.S. Fish and Wildlife Service ("FWS") to close subsistence fishing on chinook salmon.  These closures resulted in an economic disaster for the set net fishery and many processors, their crew members and employees, and led to significant over-escapement to the Kenai, Kasilof, and Susitna Rivers.  To make matters worse, the state continued to promise that it would open the set net fishery and encouraged set net fishermen and processors to retain their employees during these closures.  While relying on these empty promises, these set net employers incurred additional expenses to

*United Cook Inlet Drift Association, et. al., v. NMFS, et al.*

their ultimate detriment because the state never re-opened the fishery.  As a result, many set net

fishermen, lost *their entire yearly income* due to these closures

71.     As a result of these management failures, the Governor of Alaska ultimately

requested the Secretary of Commerce to declare a fishery management disaster for Cook Inlet.

The Secretary issued a disaster declaration on September 13, 2012.  Contrary to the state's faulty

predictions, chinook returns for the Kenai were well above biological escapement goals.  In

short, the severe fishery closures mandated by the state (and the associated economic and

financial ruin) were entirely unnecessary and detrimental to fisheries and fish stocks.

72.     In addition to state mis-management, Cook Inlet stocks are under pressure from

habitat-related concerns and population pressure.  More than one-third of the population of

Alaska resides on Cook Inlet.  The development from this population and associated

infrastructure not only creates habitat impacts, but further creates significant resource pressure

for sport and personal use fisheries (fisheries for home consumption).  In addition to these

impacts, invasive species such as northern pike have decimated a number of salmon runs in the

Inlet.  The state has known about these species for many years, yet has done little to address the

problem despite repeated pleas from Plaintiffs.

73.     These management errors, and others, combined with population and resource

pressure and habitat concerns, leave the world-class wild salmon runs of Cook Inlet salmon

fisheries at significant risk.  In recent years, the sockeye runs to five lakes – Trapper, Red Shirt,

Neal, Sucker, and Caswell – have disappeared entirely.  Returns to a sixth lake – Shell – appear

poised for extirpation as well.  In addition, there are now seven stocks listed as "stocks of

concern" in Cook Inlet.  The net result is that commercial fishing, and the health of the stocks, is

on the decline in Cook Inlet under continued state management.

*United Cook Inlet Drift Association, et. al., v. NMFS, et al.*

20

**Amendment 12 to the Salmon FMP**

74.     In 2007, Congress amended the MSA to require all fishery management councils to amend their FMPs to "establish a mechanism for specifying annual catch limits in the plan (including a multiyear plan), implementing regulations, or annual specifications, at a level such that overfishing does not occur in the fishery, including measures to ensure accountability."  16 U.S.C. § 1853(a)(15).  Congress gave the fishery management councils a deadline of "fishing year" 2011 to accomplish this goal for any fishery that was not being over-fished.  *Id.* § 1853 note.

75.     In 2010, the Council began the process of amending the Salmon FMP to comply with this statutory deadline.  Plaintiffs, and their members, fish processors, and community leaders from Cook Inlet enthusiastically participated in the Council's process.  Plaintiffs explained in public testimony and written comments that the salmon fisheries in Cook Inlet were experiencing significant management concerns that have resulted in reduced run strengths, wasted harvests, and reduced salmon quality.  Plaintiffs further explained that the state was not managing this fishery in a manner consistent with the MSA, as conceded by the state who affirmatively represented that it was not obligated to do so.  Accordingly, Plaintiffs asked the Council to update the FMP for the West Area, provide management goals and objectives for Cook Inlet and annual catch limits (or an appropriate proxy for annual catch limits) as required by the MSA, and then delegate management to the state consistent with these goals and objectives.  This is precisely what the Council proposed to do (and did) for the federal salmon fisheries in the East Area, and Plaintiffs explained that similar measures were necessary to address ongoing management concerns in Cook Inlet.

76.     Plaintiffs also offered to work with the Council, and with Defendants, to secure funding to carry out those tasks.

77.     Instead of granting Plaintiffs' request or working with the commercial salmon fishing groups to address their concerns, Council members told Plaintiffs that their belief that the Council could provide them any help was "naive and misguided" or "ill-founded, at best."  The Council emphasized that the "National Marine Fisheries Service does not have the expertise . . . to effectively manage salmon fisheries," and that it was naive to expect that the federal agencies could help the state achieve the optimum yield required by the MSA or help stabilize unpredictability in the management of the fishery.

78.     Instead of complying with Congress's annual catch limit requirement, the Council, with the support of Defendants, adopted Amendment 12 to the FMP, which provides no annual catch limits for Cook Inlet.  Instead of including annual catch limits in the Salmon FMP for Cook Inlet, the Council redrew the map of the West Area to withdraw Cook Inlet from inclusion in the West Area and the Salmon FMP altogether.  In so doing, the Council effectively abdicated all federal responsibility for managing salmon in Cook Inlet, contrary to the MSA.

79.     The Council also conceded that Amendment 12 would create a jurisdictional loophole for any fishing vessel not registered under the laws of the State of Alaska.  The loophole now allows any fishing vessel access to the EEZ portions of Cook Inlet without any time or gear restrictions.

80.     NMFS's staff told Plaintiffs that these changes were made by the Council in order to *avoid* compliance with Congress's mandate to set annual limit requirements for Cook Inlet and the other West Area fisheries.

**NMFS Approves Amendment 12 and Issues a FONSI**

81.     The Council submitted Amendment 12 and its implementing regulations to NMFS

for approval in December of 2011.  On April 2, 2012, NMFS published notice of Amendment 12

in the Federal Register and solicited public comment.  77 Fed. Reg. 19,605 (Apr. 2, 2012).  On

April 11, 2012, NMFS published notice of the draft rules implementing Amendment 12 and

solicited public comment.  77 Fed. Reg. 21,716 (Apr. 11, 2012).

82.     Plaintiffs submitted comprehensive comments on Amendment 12, the proposed

implementing regulations, and the draft EA, on May 29, 2012.

83.     Plaintiffs' explained that the Council's decision to remove Cook Inlet from the

Salmon FMP was arbitrary, capricious, and contrary to law and asked the Defendants to reject

Amendment 12 and its implementing regulations as inconsistent with the requirements of the

MSA.

84.     Plaintiffs also submitted detailed comments on the errors in the EA, the failure of

the EA to comply with NEPA and its implementing regulations, and the need for a full EIS.

85.     On June 25, 2012, NMFS issued its final EA and FONSI, concluding that

Amendment 12 would have no significant impact on the environment.

86.     The final EA and FONSI concluded that no EIS was necessary.

87.     The final EA and FONSI did not consider the alternative of treating Cook Inlet

differently from the other federal fisheries in the West Area.

88.     On June 29, 2012, NMFS approved Amendment 12 to the FMP in a one-

paragraph letter.  The letter explained that regulations to implement Amendment 12 would

follow at a later date.  Under the MSA, such regulations must be issued within 30 days after the

end of the public comment period.  16 U.S.C. § 1854(b)(3).

*United Cook Inlet Drift Association, et. al., v. NMFS, et al.*

89.     On August 16, 2012, after the close of the official comment period, and after NMFS failed to promulgate final regulations within the time prescribed by 16 U.S.C. § 1854(b)(3), Plaintiffs submitted additional new information to NMFS regarding the 2012 disaster declaration requested by the Governor of Alaska for Cook Inlet.  Plaintiffs explained that these management errors seriously undermined the Council's assumptions that the state was properly managing these fisheries, as well as NMFS's assumptions underlying the EA and FONSI.

90.     On September 13, 2012, Acting Secretary of Commerce Rebecca Blank declared a fishery disaster in Cook Inlet.

91.     On October 22, 2012, Plaintiffs again submitted new information to NMFS regarding fishery management in Alaska.  This time, Plaintiffs submitted a letter from FWS raising serious and significant concerns regarding the State of Alaska's sustainable escapement goals, explaining that they were scientifically unsound and unsupported.  Plaintiffs further explained that this analysis completely undermined the Council's reasoning (as well as the reasoning in the EA) that the state was managing the fisheries in a manner consistent with the MSA, or that the state's sustainable escapement goals were the equivalent of the MSA's optimum yield.

92.     On December 21, 2012, nearly four months after the statutory deadline to issue final regulations expired, NMFS published its notice of approval of the regulations implementing Amendment 12.  The decision relies primarily on national standards 3 and 7 as its justification for removing Cook Inlet from the Salmon FMP.

93.     The Federal Register notice supporting the rule failed entirely to address the importance or relevance of the 2012 fishery disaster in Cook Inlet or the criticism of the FWS.

## FIRST CLAIM FOR RELIEF

### (Violation of the MSA and the APA)

94.  Plaintiffs incorporate by reference all preceding paragraphs of this Complaint.

95.  MSA Sections 304(a) and (b), 16 U.S.C. §§ 1854(a)-(b), require Defendants to ensure FMPs and implementing regulations are consistent with the requirements of the MSA.

96.  Amendment 12 and its implementing regulations violate Sections 304(a) and (b) because NMFS's decision to remove the Cook Inlet salmon fisheries from the Salmon FMP is contrary to the express purpose of the MSA regarding anadromous stocks, and express requirements that an FMP is necessary "for each fishery under its authority that requires conservation and management," because the Cook Inlet salmon fishery clearly requires conservation and management. *Id.* § 1852(h)(1).

97.  Amendment 12 and its implementing regulations violate Sections 304(a) and (b) because NMFS's decision to remove the Cook Inlet salmon fisheries from the Salmon FMP is contrary to the Congressional mandate to establish annual catch limits for each fishery, especially where, as here, NMFS explained that the reason for the removal was to avoid compliance with the annual catch limit requirement. *Id.* § 1853(a)(15).

98.  Amendment 12 and the implementing regulations violate Sections 304(a) and (b) and are otherwise arbitrary and capricious because NMFS's decision to remove Cook Inlet from the Salmon FMP creates a jurisdictional loophole allowing unregistered vessels to fish with impunity in the EEZ portions of Cook Inlet.

99.  Amendment 12 and the implementing regulations violate Sections 304(a) and (b) and are otherwise arbitrary and capricious because NMFS relied on unsupported assumptions regarding the sufficiency of State of Alaska management in Cook Inlet, while ignoring data and

*United Cook Inlet Drift Association, et. al., v. NMFS, et al.*

73222032.3 0014655-00002

analysis submitted by Plaintiffs and the former State of Alaska area biologist for Cook Inlet

providing clear evidence to the contrary.

100.    Amendment 12 and the implementing regulations violate Sections 304(a) and (b)

and are otherwise arbitrary and capricious because NMFS failed to reconcile or address the 2012

fishery disaster with its determination that an FMP for Cook Inlet is not necessary.

101.    Amendment 12 and the implementing regulations violate Sections 304(a) and (b)

and are otherwise arbitrary and capricious because NMFS failed to reconcile or address concerns

raised by the FWS regarding problems with the state's sustainable escapement goals.

102.    Amendment 12 and the implementing regulations violate Sections 304(a) and (b)

and are otherwise arbitrary and capricious because NMFS's justification for removing Cook Inlet

from the Salmon FMP based on national standard 3, 16 U.S.C. § 1851(3), is (a) legally and

factually flawed, premised on the incorrect assumption that the State of Alaska is managing

salmon fisheries in Cook Inlet in a manner consistent with the MSA, and (b) fails to explain why

NMFS cannot cooperatively manage the fishery with the state as it does in the East Area and

with other fisheries.

103.    Amendment 12 and the implementing regulations violate Sections 304(a) and (b)

and are otherwise arbitrary and capricious because NMFS's justification for removing Cook Inlet

from the Salmon FMP based on national standard 7, 16 U.S.C. § 1851(7), and the factors

contained in the implementing regulations, is based on an impermissible interpretation of that

standard, lacks factual support in the record, is contrary to its own prior statements and the

evidence submitted by Plaintiffs, and otherwise fails to address important parts of the problem.

104.    Amendment 12 and the implementing regulations violate Sections 304(a) and (b)

and are otherwise arbitrary and capricious because NMFS fails to meaningfully address concerns

related to national standard 10, 16 U.S.C. § 1851(10) (safety of life at sea).

105.   Amendment 12 and the implementing regulations violate Sections 304(a) and (b) and are otherwise arbitrary and capricious because the decision that no federal management is necessary for Cook Inlet salmon cannot be legally or logically reconciled with the NMFS's decision to close fishing on these same stocks of fish in the remaining portions of the West Area, its decision that an FMP was necessary for federal salmon fisheries in the East Area, and the overall poor record of state management in Cook Inlet.

106.   The MSA allows judicial review pursuant to the APA, 5 U.S.C. § 706(2)(A), (B), (C), or (D).  16 U.S.C. § 1855(f)(1)(B).  Those provisions of the APA authorize reviewing courts to set aside federal agency action that is arbitrary, capricious, an abuse of discretion or contrary to law, in excess of statutory limitations, or without observance of the procedures required by law.  5 U.S.C. § 706(2).

107.   NMFS's approval of Amendment 12 and its implementing regulations violates 16 U.S.C. § 1854(a) and (b) because the decision to remove Cook Inlet from the Salmon FMP is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with the law, and without observance of procedure required by law.

108.   By failing to comply with the MSA, NMFS has both prejudiced and injured Plaintiffs' rights and interests, and Plaintiffs have no other adequate remedy at law.  For these reasons, Plaintiffs are entitled to the relief requested below.

## SECOND CLAIM FOR RELIEF

### (Violation of NEPA and the APA)

109.   Plaintiffs incorporate by reference all preceding paragraphs of this Complaint.

110.   NMFS did not adequately consider the potential for significant environmental effects from the proposed action.  Among other failings, NMFS did not (1) adequately consider the context and intensity of potential adverse environmental effects; (2) fully consider or properly analyze socioeconomic effects; or (3) comply with NEPA's requirements for addressing incomplete or unavailable information.  *See, e.g.*, 40 C.F.R. §§ 1502.16, 1502.22, 1508.9-.10.

111.   NMFS violated NEPA and its implementing regulations, and otherwise acted arbitrarily and capriciously, by relying on a stale Programmatic EIS from 1978 and a 1990 EA evaluating the Salmon FMP, neither of which fully considered the issue of whether to remove Cook Inlet from the Salmon FMP.  Because the decision to remove Cook Inlet from the FMP was a substantial change from the actions contemplated in 1978 and 1990, and because there is significant new information since 1990 on the condition of the fisheries in Cook Inlet, a supplemental programmatic EIS was required.  NMFS's failure to produce such a supplemental EIS was arbitrary, capricious, and contrary to NEPA.

112.   NMFS violated NEPA and its implementing regulations, and otherwise acted arbitrarily and capriciously, by failing to produce a full EIS to properly address the significant direct, indirect, and cumulative environmental impacts identified by Plaintiffs.  An EIS was necessary in light of the uncertainties identified by the Plaintiffs as well as the uncertainties identified in the notice accompanying the rule, in light of the controversial nature of the action and its effects, and in light of unprecedented nature of the decision to remove an important fishery from the oversight of an FMP.

113.   NMFS violated NEPA and its implementing regulations, and otherwise acted arbitrarily and capriciously, by failing to produce a supplemental EIS or EA in light of significant new information submitted to NMFS after it issued its FONSI regarding the fishery

disaster declaration and the state's recent mismanagement of this fishery, as well as the new questions raised by FWS.

114.    NMFS violated NEPA and its implementing regulations, and otherwise acted arbitrarily and capriciously, because it relied on a deficient EA that does not consider a reasonable range of alternatives, including the alternative of treating Cook Inlet differently than the other two federal salmon fisheries in the West Area.

115.    NMFS violated NEPA and its implementing regulations, and otherwise acted arbitrarily and capriciously, because the EA fails to take a hard look at the direct, indirect, and cumulative impacts of continued state management of the Cook Inlet fishery.

116.    NMFS violated NEPA and its implementing regulations, and otherwise acted arbitrarily and capriciously, because the EA fails to take a hard look at the impact of unregulated fishing by unregistered vessels in Cook Inlet.

117.    NMFS violated NEPA and its implementing regulations, and otherwise acted arbitrarily and capriciously, because the EA fails to take a hard look at the status and population trends of all stocks in Cook Inlet.

118.    These violations of NEPA, 42 U.S.C. § 4332(2)(C), (E), and its implementing regulations are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and without observance of procedure required by law. These violations have caused or threaten serious prejudice and injury to Plaintiffs' rights and interests. NMFS's actions under NEPA are reviewable under the APA, 5 U.S.C. §§ 701-706, and Plaintiffs are entitled to the relief requested below.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

*United Cook Inlet Drift Association, et. al., v. NMFS, et al.*

A.      Declare that the Defendants violated the MSA, APA, and NEPA;

B.      Declare that the Defendants' actions, as set forth above, were arbitrary and capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law;

C.      Vacate Amendment 12 and its implementing regulations, and, as appropriate, remand with an order instructing the Defendants to develop an FMP for Cook Inlet that complies with the requirements of the MSA, APA, and NEPA;

D.      Vacate the FONSI, and remand with an order instructing, as appropriate, the Defendants to prepare an EA or EIS that complies with NEPA and the APA;

E.      Award Plaintiffs their reasonable attorney fees, costs, expenses, and disbursements, including attorney fees associated with this litigation pursuant to the Equal Access to Justice Act or other law; and

F.      Award Plaintiffs other and further relief as this Court may deem just and equitable.

DATED this 18th day of January, 2013.

STOEL RIVES, LLP

*/s/ Beth S. Ginsberg*
Beth S. Ginsberg, D.C. Bar No. 448118
Jason T. Morgan, WSBA No. 38346
600 University Street, Suite 3600
Seattle, Washington  98101
Phone:  (206) 624-0900
Fax:  (206) 386-7500
Email: bsginsberg@stoel.com
jtmorgan@stoel.com

*Attorneys for Plaintiffs United Cook Inlet
Drift Association and Cook Inlet Fishermen's Fund*

*United Cook Inlet Drift Association, et. al., v. NMFS, et. al.*

73222032.3 0014655-00002